Ms. Clarke, will you call the next case, please? 312-595-LRN Holding, Inc. Assemblance by Robert Riffle v. Robert Bosch Tool Corporation, et al. Appellees by Stephen O'Neill. Mr. Riffle. Thank you, Your Honor. May it please the Court, Counsel. Robert Riffle, appearing today on behalf of LRN Holding, Inc. The case presents three different issues that we've briefed for purposes of appeal. The first and predominant issue is a question of contract construction, and I believe it's fair to say that both sides have freely acknowledged that this is a question of contract construction subject to de novo review. We have a contract. Both sides come in and say, pursuant to well-established rules of contract construction, we win. That's the predominant issue as to the language, in particular, in our view, Section 3.2 of this escrow agreement, which says, in no event later than April 2, 2009, the amount remaining in an escrow account shall be distributed to my client as a ministerial and mandatory obligation of the escrow agent unless one particular thing happens, and that is the filing of a timely indemnification claim. No timely indemnification claim was filed by the indemnity cutoff, and again, we believe, pursuant to clearly established rules of contract construction, my client was entitled to the release of those funds as requested on or before April 2 of 2009. By way of perspective, this was a transaction, the purchase price of which was $50 million. $48 million of that was paid directly in some form or another, not all in cash, some in credits, et cetera, but the last $2 million of my client's money on the purchase price, not money that was in debate to begin with, $2 million of my client's purchase price was put in this escrow account, and it was heavily bargained for escrow account. This wasn't a boilerplate document somebody pulled off the shelf. This is something that went through various iterations. There's an earlier draft, uncontroverted. There's an earlier draft that would have required joint instructions before any money came out of that escrow account to anyone. That was bargained out of there, and what was put in its place was a provision that says, in no event later than April 2, 2009, two days after this indemnity cutoff date, all money remaining in that fund shall be released to my client. And again, I think the words of this are so important. Two very sophisticated parties, one represented by a New York City law firm, one represented by a Chicago law firm, a tough deal in difficult financial circumstances, and they duked it out in terms of the documentation of this deal. They fought for different lines of different provisions, different words of different provisions, and what they ended up with is this agreement with what we think is overarching language, in no event. And again, it's uncontroverted in the record. My client specifically bargained for those changes in the escrow agreement. They specifically had a time-sensitive need for certain funds. And when the parties go to the trouble of saying, in no event, they have to mean something like that. The other thing that has to have some meaning is, what is a ministerial duty of an escrow agent? What I think Walsh is really saying is the escrow agent should have paused at that point, even though it says, in no event, later than this date you release the funds. They should have paused, applied some discretion, applied some kind of analysis at that point. But I think that does a great injustice to the law of escrows and the law of contracts. Why should the escrow agent at that point, faced with clear language in the agreement that says, here's the date you're supposed to release this money, they know of no reason on April 2nd not to release that money, and they should have done it. Okay, is it a hard bargain? Is that a tough result? Possibly so. But we're dealing with a multinational company buying a $50 million deal in a transaction. There are aspects of this deal that my client doesn't like. The purchase price they sold in a very difficult and challenging financial environment. But they're held to the benefit of their bargain. We can't come back and renegotiate the purchase price. We can't go in and say, boy, we really wish we'd have bargained for this provision or that provision. We're stuck with the benefit of our bargain, and so should Walsh be because they didn't bargain into this deal a second condition precedent to the release of that money on April 2nd. What they really want to say is in no event other than an indemnification claim or a purchase price adjustment claim. But that's not what it says. It says the final release of this money shall happen unless there's a pending indemnification claim, and there was no such pending indemnification claim. The case law that everyone relies on is tried and true. There are basically maxims of law. The court shouldn't alter a party's contract to achieve a different result. You can't add provisions to a contract the parties themselves did not include. And you can't add a condition precedent to a clear agreement of the parties. This money, again, is my client's $2 million from a starting standpoint. It's part of the purchase price for this deal. There was this purchase price process. There was no mandatory requirement this termination notice be sent. The only reason the termination notice would ever be sent is in the circumstance where the buyer was entitled to money. As of March 31, 2009, the indemnity cutoff date, the facts were this. Nothing had been notified to the escrow agent as to any dispute. No indemnification claim was filed. Section 3.2 just so clearly provided for the mandatory ministerial duty. That word ministerial is right in the contract. So I guess the real question is at that point, think about it from the escrow agent's perspective, if they'd have gone ahead and dispersed that money. It says on this date in no event shall you hold the money unless there's an indemnification notice. If they'd have followed their ministerial duty, and, again, that word is in Section 4.1 of the contract, it's ministerial at that point. They don't have discretion to go in there and see what's going on. They don't have the discretion to call up and say, are you sure you really mean that this money ought to be dispersed? Mandatory shall be dispersed. The word shall is used in a mandatory fashion, and it's a ministerial duty at that point. If you look at Section 1.8 of the agreement, it doesn't contemplate that there even is going to be an accounting beyond that provision, beyond that March 31 date, unless there's an indemnification claim. They're saying at that point the tents are folded. We're done here. One thing and one thing only, that is a timely filed indemnification. Without that, again, we think the case law is absolutely clear, but the escrow agent had no right to hold that money that belonged to my client. It's the remaining part of the purchase price that was being held under these expressly bargained-for provisions, should have been released as of that April 2nd date. We believe the case law on that is just absolutely clear-cut. In terms of a timeline, your client agreed to arbitration on the matter? Did it not? I mean, did you raise that issue prior? Before we agreed to arbitration, we had an agreement that nobody was waiving their rights to this particular client. So we agreed to the arbitration on an express- The person that's involved in this action? Yes. Yeah, we had an express agreement that we would agree to disagree on that and arbitrate subject to reservation of our claim. Again, this was a mandatory ministerial obligation. Turning very briefly to what then happened in the arbitration, we have just the fundamental difference of opinion here. What we believe should have happened, first of all, we think there should have never been the arbitration because of the mandatory ministerial duty. But getting to that, it was referred to this accounting firm to determine whether on a consistent basis the estimated balance sheet prepared by my client and the closing statement prepared by Bosch were prepared in a consistent manner and whether there were any discrepancies. What Bosch did is they came in and they substituted their discretionary means of dealing with accounting issues for my client's historical way of doing things. In 2005, 2006, 2007, and 2008, my client had a consistent practice of how they dealt with accounting issues. Now, Bosch doesn't think that was a good accounting system. CBIZ, the accounting firm, went so far as to call it nonsensical. But the bottom line is, and I'm quoting here from CBIZ, to suggest one should adopt an arbitrary and capricious historical accounting policy that is untested and ripe for material misstatement is nonsensical at its core. Well, the problem with that analysis, with all due respect to CBIZ, is that's exactly what the parties agreed to. And it wasn't as though Bosch was without a remedy here. They had a two-step process they could have followed. The accounting process, the purchase price adjustment, was just an apples-to-apples comparison. Here's your estimated balance sheet. Here's your closing statement. Did you do it consistently? And does the math add up? And there's a $5,000 discrepancy between where we were and where they were. That should have been the extent of the accounting-related true-up. What Bosch went in and did, and what CBIZ basically allowed them to do, is go in under GAAP, generally accepted accounting principles, and retool the entire way that the receivables and inventory were booked. They came in and said, look, you haven't been doing this right for the last five years, and we're going to redo this, and we're going to make over $2 million of changes to your accounting system, to the manner in which you did it. They didn't come in and say we didn't get as much receivables as we were supposed to. They came in and said, you know, some of these receivables should have been written off at an earlier date. Some of these receivables were uncollectable. Some of this inventory is obsolete. And those are indemnification claims, because my client made representations in terms of compliance with GAAP, and they made representations as to the usability of all the inventory. And so I think Bosch would have been perfectly within their right by March 31 of 2009 to file one or more indemnity claims, but they didn't do that. They simply did nothing before that date, and then they come in really through the back door and are arguing that they're entitled to not on a consistent basis apples to apples, but on an entirely different accounting system, which was much more rigorous to go in and say, wait a minute, we think these receivables are too old. But the point of that really from our perspective is if they were on the books and had been consistently treated for the last four or five years, then we met the requirement of consistency between estimated balance sheet and the closing statement, and that any discrepancies beyond the apples to apples comparison should have been dealt with as an indemnity claim and not as a purchase price adjustment, where we would have had the opportunity to counter that. We would have mitigation of damages, defenses, discovery. The purchase price adjustment from my client's perspective, what we bargained for was a very brief, abbreviated apples to apples comparison. Did you get all the receivables we said we gave you? And indeed, there were discrepancies. We say 622,000. They say 627,000 of discrepancies on this apples to apples basis. But again, there's not a $2 million discrepancy on apples to apples. If you really look at what they're saying, they're saying our accounting system is better than yours. Ours complies with generally acceptable accounting principles. Yours doesn't. But they're criticizing the historical practices going back five years, and that, with all due respect, is not a proper purchase price adjustment. But, I mean, whether or not that's the proper way to measure that and whether that's indemnification or purchase price, didn't they raise it, though, under Section 3.1 of the escrow agreement? No. They filed nothing with the escrow agent. The escrow agent had no notification whatsoever as of that point in time. The parties had exchanged documents. I'm not between the parties. I didn't mean with the escrow agent. Sure. But they invoked that clause, you know, we want a purchase price adjustment. We're going to argue with you a little bit about that. They certainly did that, Your Honor. And so in doing so, does it then 3.1? I mean, you have this whole escrow agreement, you know, that you can't just parcel out a part of it because Section 3.1 is saying, you know what, we're going to have a dispute about purchase price. The escrow money is going to be held. If we have a dispute over indemnification, this money is going to be held. Respectfully, Your Honor, that's not what 3.1 and 3.2 say. 3.1 and 3.2 are silent as to the separate purchase price. 3.2 simply says in no event shall any money be held unless there's a validly filed indemnification claim, and that indemnification claim had to be filed with the escrow agent, not just with the parties. But 3.1 speaks to that the money couldn't be released if there was a dispute over the purchase price. Respectfully, it doesn't say that. There's nothing that says the money can't be released. 2.1 provides for the release of money if a determination notice is filed that says the buyer is entitled to some of their money back. But it doesn't have any provision as to the escrow agent holding that money. There's nothing in the agreement that allows the holding of money other than Section 3.2 that says it can only be held if one or more timely filed indemnification claims are filed. And, again, Section 1.8 is consistent with that. There's only going to be an accounting if there's money held under 3.2. There's just no mechanism to hold money with respect to that. The final argument that we brief, and I think it's a fairly straightforward issue, we're fighting over an escrow account here. The court, we think, erroneously entered a judgment against LRN, and also the BOSH is seeking post-judgment interest and such on that, and we think the contract is absolutely clear, in fact, not even disputed by BOSH, that they're not entitled to a judgment, per se, against LRN. This is only with respect to the unstilled domesto. For those reasons, Your Honors, we respect the request for reversal. Thank you. Thank you, Mr. Riffle. O'Neill. Good afternoon. May it please the Court, my name is Stephen O'Neill. I represent Robert BOSH Tool Corporation Council. We're here to interpret a contract. We're asking the Court's assistance in that process, and throughout this case at every level, twice in the appellate court and once in front of a CPA firm, the result has been the same, which is this contract should be interpreted in a way that makes sense, and that rather than focus on a particular provision in a particular section that deals with indemnification claims, because that's not what we're here for, that we should look at the contract as a whole. We should look at the escrow agreement as a whole. We should look at the global purchase agreement as a whole, that you can't construe a contract by hyper-focusing on a particular provision in a particular section that addresses a different type of claim than the one at issue here. You have to read a contract as a whole and in a way that harmonizes its provisions and makes sense and gives life to the intent of the purchase. What Mr. Riffle and LRN are asking you to do is to find that the passage of an indemnity cutoff date, and the passage of that claim without submitting an indemnity claim notice, deprives us of our purchase price adjustment rights. And we're not asserting an indemnity claim here. What notice would Bosch have asserted? What notice would it have given to stop the clock on this? As Justice O'Brien pointed out, there is a separate section of the escrow agreement. There's an entire Article II that would in effect be negated by the interpretation that LRN advocates. There's an entire section of the global purchase agreement that provides for a reconciliation process of the purchase price adjustment, a back and forth of documents, negotiations, arbitration if necessary. And the parties were going through that process and were on the eve of an arbitration when LRN pulled the rug out from under us and said, oh, you've missed the indemnification cutoff date, even though we're not asserting an indemnification claim. There are two different types of claims. There's a purchase price adjustment claim. There are indemnification claims. They have different processes for resolution, different timetables. There's no specific timetable for the resolution of the purchase price adjustment claim. Different forms of notices so that the escrow agent would get a determination notice in the event upon resolution of the purchase price adjustment claim. There's been no determination notice in this case. What was this escrow agreement set up for in your opinion? It was set up for two purposes, for resolution of both a purchase price adjustment claim and an indemnification claim. And yet the language in the escrow agreement only addresses one. No, I disagree. Article 2 says the money is there for the purchase price adjustment claim. Article 2 of the escrow agreement that they ignore, that they say would in effect become moot, would be negated by the passage of the indemnity cutoff date, does address the purchase price adjustment. And Judge Borden, in his ruling below, said, if I just looked at Section 3.2, maybe. But I've got to look at Article 2, and I've got to look at the GPA. And even in Section 3.2 and 3.1, this cutoff date is triggered by the passage of an indemnity cutoff date, which again, not the claim we're asserting. So to rely on that single phrase in Section 3.2 would negate Article 2, would eliminate the entire reconciliation process, would cause a forfeiture of our purchase price adjustment claim that was negotiated by the parties, the $2 million negotiated by the parties to be held in escrow was for that purpose. Are you without a remedy if this escrow agreement was actually executed with the lack because there was no indemnification claim? We are limited to the escrow agreement to pursue our claims for both purchase price adjustment and indemnity. We're not asserting indemnity claims. So if the court determines that the money is not in escrow for purposes of the purchase price adjustment claim, then we are exonerated. That's our only source of funding to resolve these two separate types of claims. So the interpretation as a whole doesn't make sense. The parties would not have intended, Mr. Ripple points out, these are sophisticated parties. And they are. And they would not have put millions in escrow for the express purpose of resolving a purchase price adjustment claim. They wouldn't have agreed to this detailed reconciliation process and an arbitration in front of a CPA firm and agreed to a specific form of notice to resolve the purchase price adjustment claim if that entire process could be ground to a halt by the failure to file a notice of a different kind of claim. They just don't line up. And that's the problem, the ultimate problem with their theory. He said it several times. There was no indemnity claim notice filed. We're not asserting an indemnity claim. What do you construe to be an indemnity claim? Indemnity claims arise under Section 7 of the GPA, of the Global Purchase Agreement, and those are general sorts of breach of contract, breach of warranty, and representation type claims. We're asserting purchase price adjustment, which is the process under which the parties exchange balance sheets, one about a week before closing, one 60 days after closing, after Bosch has all of the books and records, and a comparison of the net book value in those two balance sheets, in effect. And that's the process that was to be submitted to the arbitrator in the event that there was no resolution. Now, there could be overlap of those two claims because they don't line up perfectly. They're not totally congruent, but if there was a false statement in a financial statement, Bosch might have had an indemnity claim that it didn't assert, but that claim usually is a multiple of earnings. These companies are bought based on multiples, so if there's a mistake of $1 million in receivables, we could sue them for $5 or $7 or $10 million. That's not what we're asking for. We're asking for the dollar-for-dollar adjustment, accounting adjustment, for the receivables and inventory that were misstated. And jumping ahead to that issue, Mr. Riffle says they didn't use our accounting policies. We set our reserves on a discretionary basis. And what really happened, and of course the court I don't think needs to get into the particulars of the accounting arbitration because that decision by the arbitrator should be given great deference, and the only basis for upsetting what the arbitrator did here would be to show that he exceeded his powers, which he didn't. What they're really asking for, they're saying he didn't interpret these provisions relating to how we compare financial statements in the way that we think he should have. But it clearly was in a section of the purchase price adjustment provisions of the GPA that were part of that accounting arbitration determination. So to wrap up the contract interpretation issue, the only reasonable construction here, and the one that was adopted by Judge Borden after hearing on a motion for summary adjustment, is the money does stay in escrow until the purchase price adjustment is resolved, that there should be a substantive resolution of that issue because the parties could not have intended this kind of trap door in effect that LRN attempts to create. Because it really is a trap door. It's you didn't file a claim for a notice of a claim you weren't asserting and therefore you lose all your rights. The arbitration award and the arbitration process, to put a little reality into this, because Mr. Ripple speaks at a very high level about that process, it was primarily the correction of accounting mistakes. So the big problem with respect to receivables was that there were these things called chargebacks, and LRN would bill its clients or its customers for products. The customer would then short pay, pay less than the full amount of the invoice, for usually one of two reasons. Either there was a volume discount or there was a late charge. And LRN just didn't book it, just didn't book the credit memo, didn't adjust the receivable for that. That's about $1.4 million. That's just stuff that you go through their records and you see they just didn't book it. So it's not this high-level setting of reserves type of issue, but those are things that were far better suited for resolution in this accounting arbitration than for a court to step in and say, we think that the accountant didn't compare apples to apples. The apples-to-apples theory that Mr. Ripple espouses is really so simplistic, and if you go to page 48 of his brief, he'll lay it out for you and say, all that was supposed to happen was a comparison of gross receivables and gross inventory, and so we should look at this number and this number and do the addition or subtraction. If that were the case, we wouldn't need the whole process for resolving accounting-related disputes, and we wouldn't need a CPA firm to come in and resolve those. Their interpretation of consistency is so narrow that it can't be what the parties intended. We've cited a case called Campo v. May Department Store. It's very close on its facts, a federal court case in which the court says, we can't interpret this to mean that even a district court with a calculator could have done this. We wouldn't need an accountant for that purpose. And the agreement really supports the broader view of consistency, which is consistency means you have to have a whole accounting methodology consistent from one financial statement to the next. It doesn't mean, as they suggested, if they set a reserve, and this is what they're saying, that we're stuck with their reserves no matter what happens, no matter what we learn once we get our hands on all the books and records. That's not what it means. And they found that that's not what it means. And really their argument goes too far, because they say, we set our reserves in a discretionary way, and therefore you're stuck with them. Well, they're really not saying that either,  that the arbitrator found was arbitrary and capricious, and found that because of that, it really isn't the kind of accounting methodology that we have to hold consistent from one balance sheet to the next. The agreement says we compare net book value. They're asking you to compare gross book value. What are the changes in gross receivables and gross inventory? That's not what the agreement says. The agreement also says that their estimated balance sheet should have appropriate provisions for uncollectible accounts receivable. They never address that issue. Why is that in there if nobody can adjust the receivables, the reserves for receivables or inventory in any way? One last issue, and it's raised in the briefs, but I don't think it was raised by Mr. Riffle this morning, is the argument that there's somehow this mutual exclusivity between the potential warranty claims and purchase price adjustment claims. I want to say one thing about that, which is there's a presumption in the law that if a party has contractual remedies available to it, that they're cumulative unless the agreement specifically says that they're exclusive. There's nothing in here that says that even if Bosch could have pursued some indemnification claim here or some of what it also pursues as a purchase price adjustment claim, there's nothing that says that they're exclusive. In fact, there's a provision in the Global Purchase Agreement, section 1.14, called avoidance of double counting, which says that the amount of any credit, and this is right in the purchase price adjustment section of the agreement, the amount of any credit or adjustment taken into account in the calculation of the purchase price shall not be given economic effect more than once in favor of the party to whom such amount was paid. Meaning, to the extent that we get a dollar that we're owed under the purchase price adjustment, we can't count that dollar if we also have an overlapping indemnification claim. So here, the parties actually contemplated that two types of claims might have some overlap and specifically addressed it in the avoidance of double counting provision. Let me ask you briefly on the second issue. Do you agree, Mr. Riffle, that the judgment, the $2,375,000 or whatever, that the excess part of that judgment should be stripped? No, I agree that we're limited to the escrow funds. But the escrow funds are $2 million that might be higher because of interest. I'm not speaking to interest, either post-judgment or on the escrow. It's strictly whether the judgment is too large. Well, I think it's appropriate to enter a judgment that exceeds the amount available, if it does. We don't know exactly how much is in the escrow, so I believe that amount was set at the full. Well, let's say it's enough. Well, no. I think that the judgment could be entered for an amount higher. I think Judge Brantley and I could note that we're limited to the escrow agreement and collection, but set the amount at the full amount of the purchase price, so that if there was enough in the account to make more available, that that would be available. But we all agree that we're limited to the escrow and the $2 million plus, which really is much more than $2 million because of the expenses of the escrow agent and his counsel. And the extremely high interest rates for all. And the interest rates, which... So it's... That answers my question. Okay. Thank you. Anybody else? Thank you, Mr. O'Neill and Mr. Riffel. Thank you. I think the starting point and the ending point really is all on page three of the escrow agreement. That's where you find section 2.1 that provides for payment to the buyer in the event a determination notice is filed, which has never occurred. And then sections 3.1 and 3.2 that provide that in no event later than April 2nd, 2009, the escrow agent has to distribute whatever funds remain in the escrow account. These words could not be clearer. They're bargained for. Mr. O'Neill says, well, sophisticated parties would never have agreed to such a thing. But they did. They hammered out this agreement. This is the agreement the parties at the end of the day had. There's nothing in section 2.1 that allows any money to be repelled. Section 1.8 provides that there's only going to be an accounting through this March 31, 2009 period unless there's an indemnification claim pursuant to section 3.2. No mechanism at all to hold any money pursuant to section 2.1. Again, the plain, unambiguous language of this agreement provides for exactly the argument that we're making. Is it a tough bargain? You betcha. And, you know, that's the hand we have. But if the rules were reversed, I have no doubt Bosch would be saying, look, you've got a contract here. Live to the benefit of your bargain. I'm sure they regret in 2020 hindsight not negotiating a second condition precedent to release the funds. But there is one and only one condition precedent to release the funds. That is the provision that if an indemnification had been timely filed. Their reading of this escrow agreement is entirely unworkable. How would the escrow agent ever know if or when to distribute these funds? Do they wait forever if no notification is ever provided? Keep in mind the determination notice is only provided under 2.1 if money is due to the buyer. The escrow agent has no idea as of March 31, 2009 of any issue that would prevent them from exercising their ministerial. Again, section 4.1 says ministerial. Section 3.2 says SHAP. What they're really saying is take section 3.2, add a clause that adds a second condition precedent, and the case law says that a court shouldn't add a condition precedent when the parties have hammered out their own deal. Again, I won't reiterate because the case law is so clear, but the law with respect to sophisticated parties and the benefit of the bargain is just absolutely rock solid there. Very, very briefly on the CBIZ deal, what has happened here is an abandonment and a repudiation of the parties' agreement. CBIZ came in and they said what they did. They said to suggest one should adopt an arbitrary and capricious historical accounting policy that is untested and derived from material misstatements, nonsensical at its core. We're not going to follow it. But the parties agreed. Consistency. Prepare your estimated balance sheet and your closing statement on a consistent basis. True it up. That's the bargain the parties reached. They could have come in on an indemnification claim and said wait a minute, that's not consistent with GAAP, which we represented it would be. They could have filed an entirely separate indemnification claim and we could have litigated, not arbitrated, because we agreed to litigate any indemnification claims. They could have said this isn't consistent with GAAP. We could have said no, that inventory is worth what we said it is. But that's an indemnification claim, not a purchase price. CBIC threw out the window the agreement of the parties to do this on a consistent basis. How did you do it the last five years? As long as we're consistent in our estimated balance sheet, then they're stuck with that determination for purchase price adjustment purposes, not for indemnification purposes. We freely grant that if they had filed a separate indemnification claim, this would have been entirely different. They didn't. They didn't avail themselves of contractual rights that were fully available to them. And, again, it's the benefit of the bargain. We understand we're coming in and we're asking for a technical interpretation of this that in some circumstances could be viewed as a harsh result for Bosch. But the people that are in buying and selling distressed companies, you get what you get. You get what you bargain for. Again, the parties, sophisticated counsel, they had this out in terms of the negotiation of line by line, word by word, and the words have meaning. The word ministerial has meaning. The word shall has meaning. The phrase in no event has meaning. And so there's just no doubt about it. The contract should be interpreted as we urge. One final point. The idea that they can get a judgment against LRN as opposed to a judgment for the award of the ESPRO is just absolutely inconsistent with the contract. They've gone and asked for the opportunity to do a citation to discover assets to get my client's assets. That absolutely needs to be reversed. Respectfully, we would ask that the case be reversed. Thank you. Thank you, Mr. Whittle. And thank you, Mr. O'Neill, as well. We'll take this matter under advisement to effect with a written disposition within a short time. And we'll now, I guess, adjourn until 9 o'clock tomorrow morning.